**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION**

**IRENE MILLS,**

       **Plaintiff,**

**v.**                                 **Civil Action No. 2:11-cv-65
JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT
COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11],
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[13],
AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On August 23, 2011, Plaintiff Irene Mills ("Plaintiff"), by counsel Scott B. Elkind, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.) On January 26, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 7; Administrative Record, ECF No. 8.) On February 26, 2012 and March 26, 2012, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13.) Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.    BACKGROUND

### A.    *Procedural History*

On August 21, 2007, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began on August 21, 2007.[1]  (R. at 78-81, 213-21.)  Both claims were initially denied on March 11, 2008 and again upon reconsideration on June 26, 2008.  (R. at 102-11, 114-19.)  On July 21, 2008, Plaintiff filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") Drew A. Swank on January 12, 2009.  (R. at 34, 136-40.)  Plaintiff appeared and testified via video from Hagerstown, Maryland, while the ALJ sat in Richmond, Virginia.[2]  (R. at 36, 136, 142.)  On March 17, 2009, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act ("Act").  (R. at 85-93.)  On August 28, 2009, the Appeals Council granted Plaintiff's request for review and remanded her case to an ALJ to give further consideration to Plaintiff's maximum residual functional capacity and to obtain evidence from a vocational expert "to clarify the effect of the assessed limitations on [her] occupational base."  (R. at 97-98 (alteration in original).)

On July 12, 2010, ALJ Drew A. Swank, sitting in Richmond, held a hearing for the remand of Plaintiff's case.  (R. at 53, 175.)  Plaintiff, represented by Alan Nuta, Esquire, again appeared by

---

[1] In the ALJ's March 17, 2009 decision, he notes that Plaintiff originally filed concurrent applications on April 12, 2004, alleging disability that began January 5, 2004.  (R. at 85.)  However, these applications were initially denied on July 2, 2004 and Plaintiff did not request any further review.  (*Id.*)

[2] The transcript from the January 12, 2009 hearing erroneously states that Plaintiff appeared by video from Harristown, Maryland.  (R. at 34, 36.)  However, the Notice of Hearing dated December 20, 2008 explicitly states that Plaintiff would appear at Hagerstown, Maryland.  (R. at 136.)

video teleconference from Hagerstown, Maryland.  (R. at 53, 55, 175.)  Robert Lester, an impartial vocational expert, appeared in Richmond and testified.  (R. at 55.)  On August 20, 2010, the ALJ issued another unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Act.  (R. at 20-33.)  On June 23, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.)

## B.    *Personal History*

Plaintiff was born on April 23, 1967 and was 40 years old when she filed her DIB and SSI applications.  (R. at 213, 217.)  She completed the eleventh grade and has prior work experience as a caretaker in a nursing facility, a motel housekeeper, a factory laborer, and a sales clerk/cashier in a grocery.  (R. at 295, 300.)  Plaintiff was previously married twice, but is no longer married.  (R. at 213, 218.)  At the time of her application, she had one dependent child.  (R. at 218.)

## C.    *Relevant Medical History*

### 1.    Relevant Medical History Pre-Dating Alleged Onset Date of August 21, 2007

On September 12, 2002, Plaintiff had an appointment with Shenandoah Valley Medical System for left shoulder pain.  (R. at 423-25.)  Plaintiff reported that she had a full range of motion but that her shoulder muscles were very painful.  (R. at 423.)  Debra Allen, PA, assessed "[l]eft shoulder pain, possible strain versus dislocation."  (R. at 424.)  She instructed Plaintiff to use Bextra and Flexeril, to apply heat to her shoulder, and to follow certain lifting instructions.  (*Id.*)

Plaintiff had another appointment with Shenandoah Valley Medical System on August 12, 2003.  (R. at 419-21.)  At this appointment, Plaintiff complained of middle back pain that radiated into her left hip.  (R. at 419.)  She also complained that the pain became worse with twisting, lateral flexion, and laying forward.  (*Id.*)  Debra Allen, PA, assessed "[]ow back pain probable sacroiliitis,"

told Plaintiff to take ibuprofen and Flexeril, and gave her back stretches and exercises.  (*Id.*)

On December 5, 2003, Plaintiff visited the emergency room of City Hospital in Martinsburg, West Virginia because of pain in her tailbone after falling down three stairs.  (R. at 368.)  During this time, Plaintiff reported that she had experienced some problems with her back in the past.  (*Id.*)  Dr. Philip Van Dongen assessed her with lower back pain and a possible coccyx fracture.  (*Id.*)

On February 15, 2004, Plaintiff was again at City Hospital's emergency room with complaints of right arm and neck pain.  (R. at 376.)  She described the pain as extending down into her arm and hand.  (*Id.*)  Dr. David Ebbitt assessed her with a right shoulder/neck soft tissue injury and prescribed Vicodin for her pain.  (R. at 377.)  A week later, Plaintiff had X-rays of her cervical spine and right shoulder taken.  (R. at 399, 401.)  Dr. Dimitri Misailidis noted a "[d]ecrease in the physiologic lordosis of the cervical spine most consistent with muscle spasm."  (R. at 399.)  He also noticed that Plaintiff's right shoulder was normal.  (R. at 401.)

On March 30, 2004, Plaintiff underwent an X-ray of her cervical spine.  (R. at 395.)  Dr. John Blanco noted that there were "[s]ignificant abnormalities of disc osteophyte complexes at C5-C6 causing moderate to severe canal stenosis."  (*Id.*)

On April 24, 2004, Plaintiff was at the emergency room for neck pain after a motor vehicle collision.  (R. at 380.)  According to the emergency room record, Plaintiff's head struck the windshield after the vehicle struck a telephone pole.  (*Id.*)  An X-ray of her left knee revealed "no acute fracture" and a "[s]mall joint effusion and mild soft tissue edema over the anteromedial aspect of the proximal tibia."  (R. at 384.)  An X-ray of her lumbar spine revealed no acute fractures or dislocation.  (R. at 387.)  An X-ray of her cervical spine revealed no acute fracture and "[d]egenerative disc disease with osteophytes at C5-C6."  (R. at 388.)  Dr. John Ellis diagnosed her

with a head injury, abrasions and scratches to the face, a strain and contusion in her left knee, and loss of the lateral half of her left eyebrow. (R. at 382.)

An X-ray of Plaintiff's left knee was taken on May 19, 2004. (R. at 392.) It revealed no evidence of fracture or bone contusion. (*Id.*) It also revealed no injuries to the ligaments or tears in the meniscus. (*Id.*) Finally, Dr. John Blanco noted that a "[s]mall amount of edema in the soft tissues of the upper leg could represent a mild subcutaneous contusion." (*Id.*)

On June 29, 2004, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 409-16.) He found that Plaintiff could occasionally lift and carry fifty pounds, could frequently lift and carry twenty-five pounds; could stand, walk, and sit for about six hours during an eight-hour workday; and was not limited in pushing or pulling. (R. at 410.) He noted that she should avoid concentrated exposure to extreme cold and extreme heat. (R. at 413.) Overall, Dr. Franyutti suggested that Plaintiff's residual functional capacity should be reduced to medium. (R. at 414.)

Plaintiff was treated at Tri-State Community Health Center throughout the latter part of 2006. (*See* R. at 483-92.) On October 5 and 13, 2006, it was noted that Plaintiff has anxiety and that medication would be considered at her next office visit. (R. at 493, 491.) At the October 13 appointment, Plaintiff appeared nervous and was crying. (R. at 490.) Three days later, Plaintiff called the Center and complained that she was experiencing pain that radiated around her back. (R. at 489.) She reported that she had gone to the Winchester emergency room and was given Zantac, but that this did not help her pain. (*Id.*) Plaintiff was informed that if her pain became worse she should visit an emergency room, but Plaintiff said "No thanks" and hung up the phone. (*Id.*) On December 4, 2006, Plaintiff was given a trial pack of Lexapro for her anxiety disorder. (R. at 484.)

It was also noted that she has "chronic spinal stenosis." (*Id.*)

Plaintiff had an MRI of her cervical spine on December 15, 2006. (R. at 527.) Dr. John Rees noted "focal spondylosis at C5-6 with severe canal stenosis and bilateral C6 foraminal narrowing due to spondylotic ridge and uncinate hypertrophy. (*Id.*) He noted that these changes were chronic because of the "slight cord flattening without abnormal signal intensity in the cord." (*Id.*)

Plaintiff had a few appointments for her anxiety at Tri-State Community Health Center during 2007. (R. at 465-82.) On January 3, 2007, at her one-month follow up appointment, Plaintiff complained that she had seen no results with Lexapro. (R. at 479.) Her prescription for Lexapro was increased and she was provided with samples. (R. at 480.) Plaintiff also completed a self-evaluation at this appointment. (R. at 481-82.) She noted that during the past two weeks, she did not feel sad, she was not discouraged about her future, she did not feel like a failure, she felt the same about herself as usual, she did not criticize or blame herself more than usual, she did not have any thoughts of suicide, and she did not lose interest in other people or activities. (R. at 481.) She also indicated she had been experiencing moderate symptoms of numbness, an inability to relax, lightheadedness, and feelings of choking, and mild symptoms of a racing heart, shakiness, difficulty breathing, feeling faint, and having a flushed face. (R. at 482.)

On June 21, 2007, doctors at the Tri-State Community Health Center again noted that Plaintiff was suffering from depression and anxiety. (R. at 472.) Plaintiff also complained that she had not been sleeping because of back pain. (*Id.*) She thought that her nerves and mood were attributable to her back pain and also noted that she had not been feeling better on Lexapro. (*Id.*) Her prescription for Lexapro was decreased and she was also given a prescription for Paxil. (R. at 473.) Plaintiff completed another self-evaluation at this appointment. (R. at 474-75.) She noted

that in the past two weeks, she felt more discouraged about her future than she used to be, but all her other responses remained the same as they were on January 3. (R. at 475.) She also noted severe numbness, moderate feelings of being unable to relax, and mild symptoms of feeling hot, having trembling hands, difficulty breathing, and indigestion. (R. at 474.)

Plaintiff visited the WVU Department of Neurosurgery for a physical on July 31, 2007. (R. at 452-54.) At this physical, Dr. Rosen studied Plaintiff's most recent MRI of her cervical spine and "noted evidence of a herniated disk at C5-C6 causing narrowing of the spinal cord at that level." (R. at 453.) He determined that Plaintiff would benefit from an ACDF C5-C6, and Plaintiff consented to this surgery. (R. at 453-54.)

On August 13, 2007, Plaintiff had another appointment at the Tri-State Community Health Center. (R. at 465-66.) It was noted that Plaintiff's depression and anxiety medications needed filled, and her prescription for Paxil was increased. (*Id.*) Plaintiff completed another self-evaluation, and her results were the same as those from the self-evaluation done on January 3, 2006. (R. at 467.) She also noted severe symptoms of numbness, inability to relax, and shakiness. (R. at 468.) She further described moderate symptoms of trembling hands and mild symptoms of feeling hot, nervousness, difficulty breathing, and a flushed face. (*Id.*)

### 2.      Relevant Medical History Post-Dating Alleged Onset Date of August 21, 2007

On October 12, 2007, Dr. Rosen performed an anterior cervical diskectomy with allograft structural graft fusion and plate with microsurgical technique on Plaintiff. (R. at 460.) After the procedure, Dr. Rosen diagnosed her with cervical spondylotic myelopathy with herniated disk osteophyte complex at C5-C6. (*Id.*) Plaintiff "recovered well postoperatively." (R. at 445.) On October 30, 2007, Dr. Jeffery Hogg noted that there was a "[s]table posttreatment apperance of

surgical fixation at the C5-C6 level." (R. at 450.) At this appointment, Plaintiff complained of burning pain in her right upper arm, but noted that the pain was not extending as far down her arm as it had been before. (R. at 560.) A follow-up appointment on December 18, 2007 revealed a "[s]table C5-C6 with no evidence of malalignment or hardware failure." (R. at 568.)

On November 14, 2007, Plaintiff underwent a CT scan of the neck with IV contrast at Winchester Medical Center. (R. at 439.) Dr. Richard Rizzo noted post-operative changes in the soft tissues of Plaintiff's neck. (*Id.*) He also identified swelling and "mucous retention cyst or polyp in the left maxillary sinus." (*Id.*) However, he also noted that there was no evidence of any complications after her surgery based on the CT scan. (*Id.*)

Plaintiff continued to visit Tri-State Community Health Center during 2008. (R. at 652-60.) On January 11, 2008, Plaintiff's doctor noted that she needed to be referred to pain management and that she appeared very anxious. (R. at 659.) About two weeks later, the center noted Plaintiff's question about pain management referral; according to the records, Plaintiff had been referred on January 11, 2008 but Plaintiff did not respond to the calls. (R. at 657.)

Plaintiff had an MRI of her cervical spine done on January 22, 2008. (R. at 566-67.) Dr. Jeffery Hogg noted postsurgical changes in Plaintiff's cervical spine. (*See id.*) Specifically, he noted "[d]isk herniation in the midline with associated extradural mass effect at the C4-C5 level." (R. at 567.) He also noted "[d]iffuse extradural mass effect at the C5-C6 vertebral body endplate levels with narrowing of both neural foramina." (*Id.*) At her appointment with Dr. Rosen that same day, Plaintiff complained of "dysesthesias in the upper hands and arms" and "some posterior neck spasm into her trapezius region." (R. at 558.) Dr. Rosen felt that at this time, "there is no further neurosurgical intervention to be made." (*Id.*)

On March 11, 2008, Dr. Frank Roman completed a Psychiatric Review Technique of Plaintiff. (R. at 572-85.) Dr. Roman determined that Plaintiff did not have severe impairments. (R. at 572.) He noted that she suffered from an affective disorder; specifically, a mood disturbance evidenced by depressive syndrome. (R. at 575.) Plaintiff also suffered from an anxiety disorder. (R. at 577.) Dr. Roman noted that Plaintiff was mildly limited in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (R. at 582.) Overall, he found that Plaintiff was credible and that her activities of daily living were mainly restricted by physical factors. (R. at 584.)

Also on March 11, 2008, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 586-93.) He noted that Plaintiff could occasionally lift and carry twenty pounds; could frequently lift and carry ten pounds; could stand, walk, and sit for about six hours in an eight-hour work day; and was not restricted in pushing and pulling. (R. at 587.) Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; however, she could never climb ladders, ropes, and scaffolds and could never crawl. (R. at 588.) Dr. Franyutti reported that Plaintiff should avoid concentrated exposure to extreme cold, vibration, fumes, gases, odors, and hazards. (R. at 590.) He also noted that Plaintiff appeared credible. (R. at 591.) In June of 2008, two other doctors agreed with Dr. Franyutti's assessment. (R. at 594-95.)

On May 1 and 6, 2009, Dr. Harold D. Slaughter, Jr. completed a psychological evaluation of Plaintiff to provide a psychological profile for Plaintiff's medical card application. (R. at 598-604.) Dr. Slaughter noted that Plaintiff was diagnosed with panic attacks at the age of 21, but that she only experienced them when she became very upset. (R. at 600.) Plaintiff told Dr. Slaughter that she once took a bottle of muscle relaxers during an argument with her husband and had to have

her stomach pumped. (*Id.*) She was in a coma for three days and then underwent a three-day hospitalization in the psychiatric ward. (*Id.*) Dr. Slaughter noted that Plaintiff was cooperative and oriented, but appeared to walk with a limp and to have tremors. (R. at 603.) He diagnosed her with alcohol abuse, anxiety disorder, and borderline intellectual functioning. (R. at 604.) He also assigned her a Global Assessment of Functioning ("GAF") score of 30. (*Id.*)

Plaintiff began treatment at Fast Track Anesthesia Associates on October 6, 2009. (R. at 689.) On this date, she underwent trigger point injections of the left trapezius muscle for her myofascial pain. (R. at 689.) Dr. Abd Benni noted that Plaintiff tolerated the procedure well. (*Id.*) At this appointment, Plaintiff complained of constant "aching, throbbing, sharp, shooting pain." (R. at 687.) She also reported that her back pain was constant and radiated to both legs. (*Id.*) Dr. Benni increased Plaintiff's Neurontin prescription and started her on a Vicodin prescription. (R. at 688.) Plaintiff returned to the pain clinic on November 4, 2009. (R. at 684.) She reported that her previous injections "helped only minimally with regard to the left shoulder pain." (*Id.*) Plaintiff had discontinued taking Neurontin because of side effects but continued to take Vicodin, which she stated helped to alleviate some of her pain. (*Id.*) Dr. Benni performed trigger point injections on Plaintiff's right trapezius muscle for her right shoulder myofascial pain. (R. at 686.) He continued her on her Vicodin and gave her a prescription for physical therapy. (R. at 685.)

On November 15, 2009, Plaintiff was seen in the emergency room at City Hospital for ankle and knee pain. (R. at 633.) She complained that she felt "sharp shooting pain in both knees and ankles." (*Id.*) Plaintiff reported that she tried to take two hydrocodone for her pain, but did not get relief. (*Id.*) Dr. Andrew Williams assessed chronic pain syndrome and arthralgia of unclear etiology. (R. at 634.) Plaintiff was instructed to continue with her usual pain medications and to

take ibuprofen on a regular basis.  (*Id.*)  The next day, Plaintiff had another appointment at Fast Track Anesthesia Associates.  (R. at 681.)  She denied any back problems, numbness, or tingling, but she complained of stinging and burning in her thighs that radiated to her knees.  (*Id.*)  Dr. Denise Scaringe-Dietrich performed an examination of her back and found a good range of motion with no tenderness.  (*Id.*)  Dr. Scaringe-Dietrich assessed Plaintiff with multiple arthralgias and tendonitis of the medial collateral ligaments bilaterally of the knees.  (R. at 682.)  About three weeks later, Plaintiff continued to complain of severe pain in her neck and lower back.  (R. at 679.)  Dr. Scaringe-Dietrich assessed her with diffuse DJD; knee tendonitis, resolved; low back pain; neck pain; facet arthropathy; and myofascial pain disorder.  (R. at 679-80.)  She also noted that the office had received a phone call that Plaintiff was selling 50% of her medications.  (*Id.*)

On January 6, 2010, Plaintiff had an appointment with Dr. Chris Que for her pain.  (R. at 704.)  He noted that Plaintiff had a normal gait and a normal inspection of her back.  (R. at 705.)  He assessed COPD, mid back pain, and chronic pain.  (R. at 706.)  A day later, Plaintiff underwent an X-ray of her thoracic spine at City Hospital.  (R. at 709.)  Dr. Dimitri Misailidis noted that there was an indentation at the inferior end plate of T7 that suggested a Schmorl's node.  (*Id.*)  He also noted "[s]tatus post fusion of the lower cervical spine."  (*Id.*)  On January 21, 2010, Dr. Que again assessed Plaintiff with mid back pain and instructed her to continue with the pain management clinic.  (R. at 702-03.)  Plaintiff saw Dr. Que again on March 2, 2010.  (R. at 700.)  Plaintiff asked for a referral to a psychologist for "anxiety/stress."  (*Id.*)  He assessed her with COPD and stress/anxiety.  (R. at 701.)

Plaintiff continued to visit the pain management clinic during the early part of 2010.  On January 4, 2010, Plaintiff complained of severe pain in her right back and complained that it radiated

into her bilateral leg. (R. at 677.) She reported that Vicodin was "mildly beneficial" for her pain. (*Id.*) Dr. Scaringe-Dietrich assessed her with chronic low back pain, chronic neck pain, myofascial pain disorder, lumbar degenerative disk disease, and lumbar facet arthropathy. (*Id.*) She encouraged Plaintiff to apply heat to her back, do back stretches, and continue her Vicodin. (R. at 678.) She also noted that Plaintiff would be slowly weaned off opioids given her irregularity. (*Id.*) The next month, Plaintiff continued to complain of severe pain, focusing on her back. (R. at 674.) Dr. Scaringe-Dietrich assessed Plaintiff with chronic back pain, sacroiliitis secondary to psoriasis, lumbar facet arthropathy, cervicalgia status post cervical laminectomy and fusion, myofascial pain disorder, and other medical problems including anxiety and psychiatric disturbance. (R. at 675.)

On February 9, 2010, Plaintiff underwent X-rays of her lumbar spine and pelvis at city Hospital. (R. at 691-92.) Dr. Dimitri Misailidis noted that Plaintiff had "[m]ild sclerotic facet disease at L5-S1" that was "slightly worse on the right than the left." (R. at 691.) He also noted "no evidence of sacroiliitis" in Plaintiff's pelvis. (R. at 692.) On April 21, 2010, Plaintiff underwent an X-ray of her sacroiliac joints at City Hospital. (R. at 690.) Dr. Sanjay Saluja noted that Plaintiff had "[m]inimal degenerative changes in the sacroiliac joints." (*Id.*)

Plaintiff continued to have appointments at the pain management clinic in March and April of 2010. (R. at 666-73.) On March 1, 2010, Dr. Scaringe-Dietrich performed a bilateral sacroiliac joint injection under fluroscopic guidance on Plaintiff. (R. at 672.) While in the recovery room, Plaintiff reported a decrease in her pain. (R. at 673.) Two weeks later, Plaintiff returned with complaints of severe pain in her neck, arms, and back. (R. at 668.) Dr. Scaringe-Dietrich examined Plaintiff's back and noted pain with "extension greater than rotation and flexion." (*Id.*) She assessed Plaintiff with chronic low back pain, lumbar facet arthropathy, sacroiliitis, myofascial pain

disorder, neck pain, and opioid analgesic with some elements of misuse in the past. (R. at 668-69.) Five days later, Dr. Scaringe-Dietrich performed bilateral L4-L5 and L5-S1 intraarticular facet blocks under fluoroscopic guidance on Plaintiff. (R. at 670.) Plaintiff "noted significant decrease in her pain." (R. at 671.) The last appointment evidenced in the record occurred on April 19, 2010. (R. at 666.) Plaintiff mainly complained of pain in the left posterior aspect of her calf. (*Id.*) She was given a drug screen given her misuse of opioids in the past, and it preliminarily tested negative for opioids. (*Id.*) A note was made that if Plaintiff's official results came back negative, she would be discharged from her opioid agreement. (R. at 667.)

On May 13, 2010, Dr. Arthur Padilla performed bilateral sacroiliac joint injections under fluoroscopy on Plaintiff. (R. at 713.) Dr. Padilla noted that Plaintiff tolerated the procedure well but had "very overt exaggerated pain from just injection itself despite the local anesthetic." (R. at 713-14.) He diagnosed her with bilateral sacroiliitis, chronic low back pain, and lumbar spondylosis. (R. at 713.)

Dr. Slaughter completed another psychological evaluation of Plaintiff for her application to renew her medical card on May 26, 2010. (R. at 716-21.) During this evaluation, Plaintiff reported that she has to constantly switch from sitting to standing and walking to relieve her back pain. (R. at 718.) She also complained that she constantly wakes up because her pain and numbness. (*Id.*) Dr. Slaughter noted that Plaintiff had a withdrawn mood but was also cooperative and oriented. (R. at 719.) He also noted that there was "no indication of serious emotional issues." (*Id.*) Dr. Slaughter again diagnosed Plaintiff with alcohol abuse, anxiety disorder, and bordering intellectual functioning, and assigned a GAF of 42. (R. at 720.) He noted that she would benefit from pain management, individual counseling, and substance abuse counseling. (*Id.*)

On June 7, 2010, Plaintiff had another appointment with Dr. Que. (R. at 698.) She complained of severe middle back pain and noted that she had been recently discharged from the pain clinic. (*Id.*) Plaintiff also complained that Paxil was not helping with her mood and anxiety. (*Id.*) Dr. Que assessed her with COPD, back pain, and anxiety. (R. at 699.) A day later, Plaintiff saw Dr. John Burgess. (R. at 365, 723.) He noted that Plaintiff had stiffness in her right arm. (R. at 723.) Dr. Burgess told Plaintiff that he wished to perform various tests, including CT scans, and he referred her to Dr. Varga, a neurologist, for an evaluation and nerve tests. (R. at 365.) Dr. Burgess wanted Plaintiff to have these tests done before he determined a course of treatment and medication. (*Id.*)

### D. *Testimonial Evidence*

At the hearing before the ALJ on January 12, 2009, Plaintiff testified that she had completed the tenth grade but later earned her GED. (R. at 40.) She took CNA classes and noted that her license was still effective, but that no one would hire her because of her back surgery. (*Id.*) Plaintiff testified that she had been receiving food stamps but no longer was at the time of the hearing. (*Id.*) At that time, Plaintiff did not have a driver's license because she had been convicted of two DUIs. (R. at 41.)

Plaintiff testified that she had not worked since the end of 2007. (R. at 42.) In 2006, she worked for various home health care or nursing home care organizations as a cleaner. (R. at 42-43.) In 2003, she worked for Brentwood Industries, and in 2001, she worked for Brown Group Retail. (R. at 43.) Plaintiff also worked for Wal-Mart as a stocker at one point. (*Id.*)

Since 2007, Plaintiff has had surgery on her C5, C6, and a biopsy on her left side. (R. at 43.) At that time, she was not taking any over-the-counter or prescription pain medication. (*Id.*) Plaintiff

testified that she experiences pain in her neck, her arms, and her legs.  (R. at 44.)  She stated that at most, she can only lift a gallon of milk.  (*Id.*)  Plaintiff has problems with sitting and testified that she can only sit for twenty to thirty minutes at a time.  (R. at 44-45.)  She has problems walking because her left leg "stays . . . kind of numb and asleep all the time."  (R. at 45.)  She cannot open bottles but can still dial a telephone.  (*Id.*)  Plaintiff testified that her arms also stay "numb and tingly all the time."  (R. at 46.)

Plaintiff testified that she will sometimes do grocery shopping, and she will help to clean her apartment by sweeping the kitchen floor.  (R. at 46.)  At that time, she only cooked for herself and often just used a microwave to heat food.  (*Id.*)  Plaintiff noted that she often needs reminders about her appointments and other tasks.  (R. at 47.)

Plaintiff has had no psychiatric hospitalizations, and she could not remember any psychiatric treatments since August of 2007.  (R. at 48-49.)  She noted that she had been taking Paxil, but could not remember when she stopped taking it.  (R. at 49.)  At the time of the hearing, she was not in any sort of counseling or therapy.  (*Id.*)

At the July 12, 2010 hearing, Plaintiff testified that she had never worked as a cashier, but that the woman she worked for listed her as a cashier because there were no listings for stock people.  (R. at 57.)  She stated that she has memory problems because people will have to remind her about appointments and bills.  (R. at 58.)

Plaintiff testified that she has lived with a friend, Wayne Richardson, since November or December of 2007.  (R. at 58.)  Before that, Plaintiff had her own house, and her daughter lived with her.  (R. at 59.)  When Plaintiff lived with her daughter, her daughter would do most of the cleaning, laundry, and yard work.  (*Id.*)  She testified that Mr. Richardson takes care of the housework, does

laundry, opens jars for her, and shops for the groceries. (R. at 60.) However, Plaintiff still folds the laundry. (*Id.*) Sometimes she tries to do a few dishes, but she cannot stand for long because she gets headaches from being on her feet. (*Id.*) Plaintiff testified that her arm will constantly stay numb and sore. (R. at 61.)

Plaintiff testified that she was told to go to the pain management clinic and seek other help after her surgery, but that she could not go see doctors until she got her medical card. (R. at 61.) She stated that there were many medications she was prescribed that she had trouble taking because of the side effects. (R. at 61-62.) Plaintiff testified that she spends most of her day lying down and reclining because she does not sleep. (R. at 63.) She noted that she becomes uncomfortable when she cannot rest, so she will get up and walk throughout the house, which causes her hips to start hurting. (*Id.*) However, she testified that she spends most of her time in her chair "just jiggling around" to make her pain decrease. (*Id.*) Plaintiff stated that she experiences pain from her whole back down into both sides of her hips and up into her head. (R. at 64.) She also feels pain in her arms, feet, hands, and legs. (*Id.*) Finally, Plaintiff testified that she sits at home "all the time" and cries. (*Id.*)

### E.    *Vocational Evidence*

Also appearing at the July 12, 2010 hearing before the ALJ was Robert Lester, an impartial vocational expert. Mr. Lester classified Plaintiff's past work as a packer in a factory as medium, unskilled work; her work as a hotel housekeeper as light, unskilled work; her work as a caretaker in a nursing home as medium, semi-skilled work; and her work as a sales clerk and cashier in a grocery store as light, unskilled work. (R. at 66.) He also noted that Plaintiff had no transferable skills to other occupations based on her past work. (*Id.*)

The ALJ then posed the following residual functional capacity hypothetical to Mr. Lester:

Q:      Okay, I want to give you the following hypothetical of an individual in the same age category as the claimant, which is a younger individual with the same education, less than high graduate, but 11th grade, more than 6th grade, with the same transferable skills, if any, as the claimant with the following RFC: Limited to light work, with occasional climbing of ramps, stairs, occasional balancing, stooping, kneeling, crouching. Limited to jobs that do not require crawling, climbing ladders, ropes, or scaffolds, limited to positions that do not involve concentrated exposure to extreme cold, vibrations, fumes, odors, gases, or hazards, an [sic] limited to simple, unskilled work. Are there jobs in the national, regional, state or local economies, with the state being in this case for the claimant, West Virginia, that can be performed with that RFC?

A:      Yes, sir.

Q:      Can you give us some examples?

A:      Yes, sir. Light, unskilled work available to such a hypothetical individual would include work, such as a marker specific to the retail industry. The DOT number is 209.587-034. There are in excess of 400,000 such positions in the national economy and approximately 10,000 in the regional economy, which is the state of West Virginia. Also worked [sic] as a non-postal mail clerk. The DOT number is 209.687-026, 70,000 in the national economy, and approximately 1,000 regionally. And finally, worked [sic] as a router, a former paperwork dispatch work. The DOT is 222.587-038, 80,000 nationally, and about 1,200 regionally. Those are representative examples of light, unskilled work consistent with the descriptions provided in the *Dictionary of Occupational Titles*.

Q:      Okay. And is that based on any assumptions that you haven't already told us about?

A:       No, sir.

(R. at 66-68.)

Mr. Nuta, Plaintiff's representative at the hearing, posed the following questions to Mr. Lester:

Q:      Concerning unskilled jobs, how much absenteeism can there be for a person to maintain employment?

| A: | Anything beyond the routinely provided annual and/or sick leave, which is typically a day to a day and a half per month. Anything beyond that over time would preclude one's ability to maintain that work. |
|---|---|
| Q: | And for an unskilled job, how much percentage of being off-task or a loss of productivity can there be for a person to maintain employment? |
| A: | Any loss of productivity beyond 10 to 15 percent of expected productivity, again, over time, would preclude work. |

(R. at 68.)

Finally, when asked by the ALJ, Mr. Lester confirmed that there were no conflicts between his testimony and the *Dictionary of Occupational Titles* and no assumptions that he had not already explained. (R. at 69.)

In a Report of Contact form dated March 11, 2008, Daniel A. Scott of the Clarksburg, West Virginia DDS office noted that Plaintiff's past work as a cashier was light, unskilled work. (R. at 316.) Mr. Scott noted that while Plaintiff could not perform her past work as she described it, she could perform her past work as it is generally performed in the national economy. (*Id.*) In a Report of Contact for dated June 26, 2008, Michele Carpenter of the Clarksburg DDS office stated her agreement that Plaintiff was capable of returning to past work. (R. at 335.)

## F.     *Lifestyle Evidence*

In an Adult Function Report dated February 22, 2008, Plaintiff noted that during a typical day, she gets up, walks around, and lies back down because she experiences headaches, pain in her back, and numbness in her arms and legs. (R. at 302.) She reported that her conditions affect her ability to dress, shower, style her hair, and complete other personal care. (R. at 303.) Plaintiff stated that she often needs reminders to take her medications, attend appointments, and pay her bills. (R. at 304.)

Plaintiff prepares frozen foods for herself; however, she stated that she only eats about three times per week. (R. at 304.) She does do laundry and dishes. (*Id.*) Plaintiff goes outside to get fresh air and to go to the grocery store. (R. at 305.) She shops twice a month for about twenty minutes each time for food and health items. (*Id.*) Plaintiff can walk and ride in a car; however, she does not drive because she does not have a license and because her neck hurts from holding a steering wheel. (*Id.*) She can pay bills and count change, but cannot handle a savings account or use a checkbook and money orders because she does not have them. (*Id.*) However, she noted that her conditions have changed her ability to handle money because she has to give it to someone or she forgets where she puts it. (R. at 306.)

Plaintiff reported that she used to sew, ride bikes, and hike, but that she can no longer do these activities because of the pain she experiences. (R. at 306.) She spends time with others through visits; however, she does not talk on the telephone very much because it makes her arm go numb. (*Id.*) Plaintiff does not go anywhere on a regular basis. (*Id.*)

In an Adult Function Report dated May 20, 2008, Plaintiff noted that her conditions affect her sleep because of her pain. (R. at 328.) She reported that she still needs reminders to take her medications, but that she ran out of medications because she cannot afford them. (R. at 329.) Plaintiff makes sandwiches about three times a week. (*Id.*) She sweeps and does laundry, but noted that sweeping makes her arms go numb. (*Id.*) Plaintiff goes outside every day, and goes shopping once a month for about forty-five minutes for food and other items. (R. at 330.) She reported that watching television is now her only hobby. (R. at 331.)

In a Daily Activities Questionnaire received on August 22, 2008, Plaintiff noted that she sweeps and does laundry once a week. (R. at 348.) She does dishes, but stated that she does not eat

much and that she mostly uses paper plates. (*Id.*) Plaintiff watches the news and listens to the radio. (R. at 349.) She wishes that she could still play cards, but cannot because her neck and back become stiff from sitting. (*Id.*) Plaintiff reads the newspaper a couple of times per week. (*Id.*)

With regards to her work activity, Plaintiff noted that she generally reported on time, but she did not have good attendance because of pain in her neck, arms, and legs. (R. at 352.) She had trouble completing her assigned work because of this pain. (*Id.*) Plaintiff noted that she was not able to maintain her work routine because the pain caused her to have trouble concentrating. (*Id.*)

In another Daily Activities Questionnaire completed on December 23, 2009 and January 4, 2010, Plaintiff reported that she rinses her dishes, does laundry, and straightens up the house when she can. (R. at 358.) However, she has to have her friend carry the laundry. (R. at 359.) Plaintiff stated that she watches television all day but does not read. (*Id.*)

## G.    *Other Evidence*

The record contains a physical examination of Plaintiff completed on February 17, 2009 by the West Virginia Department of Health and Human Services Medical Review Team. (R. at 649-51.) According to this examination, Plaintiff had the ability to work full-time and vocational rehabilitation for a less strenuous job was recommended. (R. at 650.) However, the team stated that Plaintiff should avoid heavy lifting and exposure to noxious fumes. (*Id.*)

## III.    CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, asserts that the ALJ's decision "fails to be supported by substantial evidence, and is erroneous as a matter of law." (Pl.'s Mot.) Specifically, Plaintiff alleges that:

•       The ALJ erroneously assessed her residual functional capacity; and

•      The ALJ erroneously relied upon the testimony of the vocational expert.

(Pl.'s Br. in Supp. Mot. Summ. J. ("Pl.'s Br."), ECF No. 12 at 4-14.) Plaintiff asks the Court to grant

her summary judgment against the Defendant or, alternatively, to have "this matter remanded to the

Social Security Administration for a new administrative hearing."  (Pl.'s Mot.)

      Defendant, in his motion for summary judgment, asserts that the ALJ's decision "is

supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot.)

Specifically, Defendant alleges that:

•      The ALJ reasonably accounted for Plaintiff's limitations concerning her mental impairment

      and neck impairment when assessing her residual functional capacity; and

•      The ALJ reasonably relied upon the vocational expert's testimony.

(Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 14 at 10-14.)

## IV.    STANDARD OF REVIEW

      The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as
> to any fact, if supported by substantial evidence, shall be conclusive . . . .");
> *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v.
> Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial
> evidence" means "such relevant evidence as a reasonable person might accept as
> adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct.
> at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,
> 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the
> case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d
> 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to
> determine the weight of the evidence, nor is it the court's function to substitute its
> judgment . . . if the decision is supported by substantial evidence.  *See Laws v.
> Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.  ANALYSIS

### A.  *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If

you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled

at any of the five steps, the process does not proceed to the next step. *Id.*

**B.**     ***Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the

following findings:

> **1.      The claimant met the insured status requirements of the Social Security Act through September 30, 2009.**
>
> **2.      The claimant has not engaged in substantial gainful activity since August 21, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**
>
> **3.      The claimant has the following severe impairments: cervical disc disease status post spine surgery, asthma/chronic obstructive pulmonary disease, borderline intellectual functioning, anxiety disorder and alcohol abuse (20 CFR 404.1520(c)and 416.92(c)).**

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she could only occasionally climb ramps or stairs, balance, stoop, kneel, or crouch, and she could never climb ropes, ladders or scaffolds; she could not be exposed to extreme code, vibrations, fumes, odors, gases or hazards (such as unprotected heights or moving machinery); and she would be limited to simple, unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 23, 1967 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has the equivalent of a high school education (20 CFR 404.1564 and 416.964).

9. The claimant does not have transferable work skills to jobs within her functional residual capacity.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 21, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 22-33).

C.    *Analysis of the Administrative Law Judge's Decision*

1. The ALJ Reasonably Accounted for Plaintiff's Limitations When Assessing Her Residual Functional Capacity

As her first assignment of error, Plaintiff alleges that the "Administrative Law Judge failed to properly assess [her] limitations as required pursuant to Social Security Ruling 96-8p" when assessing her residual functional capacity ("RFC"). (Pl.'s Br. at 4 (alteration in original).) First, Plaintiff asserts that the ALJ erred in his determination that she could perform simple, unskilled work despite her mental impairments. (*Id.* at 6-9.) Second, Plaintiff argues the ALJ erred by failing to include any limitations regarding Plaintiff's concentration, persistence, and pace in his RFC assessment. (*Id.* at 9-10.) Third, Plaintiff alleges that the ALJ erred by failing "to include any limitation specifically related to [her] ability to use her neck, such as the ability to rotate her head from side to side, or up and down." (*Id.* at 10-11 (alteration in original).) However, the undersigned finds that Plaintiff's argument is without merit.

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 21996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has

the burden of production and proof through the fourth step of the sequential analysis); *see also* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

### a.  The ALJ Properly Evaluated Plaintiff's Mental Impairment

First, Plaintiff alleges that the ALJ failed to properly evaluate her mental impairment because he was "required to perform a **more detailed** assessment of [her] capacity to perform the mental demands of work." (Pl.'s Br. at 6, 8 (alteration in original).)  Specifically, Plaintiff argues that the ALJ "failed to perform this more detailed assessment, failed to consider the expanded list of work-related capacities that may be affected by mental disorders, and instead cumulated [her] mental impairments into a less-detailed conclusion that [she] was limited simple, unskilled work." (*Id.* at 8 (alterations in original).)

When assessing a claimant's RFC, an ALJ is required to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence" and "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  However, SSR 96-8p does not require an ALJ to produce a detailed statement in writing–a true "function-by-function" analysis. *See Knox v. Astrue*, 327 F. App'x 652, 657, 2009 WL 1747901, at *5 (7th Cir. 2009) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005)) ("[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient."); *Anderson v. Astrue*, No. 3:10CV583, 2011 WL 3585390, at *5 (E.D. Va.

July 28, 2011) (citing *Banks v. Astrue*, 537 F. Supp. 2d 75, 84-85 (D.D.C. 2008)) (finding that a function-by-function analysis of a plaintiff's RFC was not required under SSR 96-8p).

Contrary to Plaintiff's assertion, the ALJ did not cumulate her mental impairments into a "less-detailed conclusion that [she] was limited simple, unskilled work." (Pl.'s Br. at 8 (alteration in original).) The ALJ considered the objective medical evidence in the record and Plaintiff's testimony regarding her symptoms. (R. at 30-31.) For example, the ALJ discussed Dr. Slaughter's psychological examinations of Plaintiff. In May of 2009, Dr. Slaughter assigned Plaintiff a GAF of 30, which indicated an inability to function in almost all areas, serious impairments in communication and judgment, and behavior considerably influenced by delusions. (R. at 30, 604.) However, the ALJ determined that this GAF was inconsistent with Dr. Slaughter's own findings and other evidence in the record because Dr. Slaughter himself stated that Plaintiff had no indication of major emotional problems. (R. at 30.) Furthermore, in May of 2010, Dr. Slaughter assigned a GAF of 42 to Plaintiff. (R. at 30, 720.) Although this indicated some improvement, it still indicated serious symptoms and serious impairment in social and occupational functioning. (R. at 30.) The ALJ determined that this GAF score was underrepresentative of Plaintiff's mental status because her reported symptoms did not approach the severity of symptoms required for a GAF of 42. (*Id.*)

Given the foregoing, it is clear that the ALJ performed the narrative assessment required by SSR 96-8p and did not cumulate Plaintiff's mental impairments into a less-detailed conclusion. Instead, the ALJ took her limitations into consideration when he limited her to simple, unskilled work. (R. at 31.) Therefore, the undersigned finds that Plaintiff's argument is without merit.

### b. The ALJ Considered Plaintiff's Limitations On Concentration, Persistence, and Pace When Assessing Plaintiff's RFC

Second, Plaintiff asserts that the ALJ failed to include "any limitation on concentration,

persistence, and pace in his residual functional capacity assessment" despite his finding that Plaintiff had moderate difficulties in maintaining these. (Pl.'s Br. at 9.) She cites *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009) for her assertion that a limitation to simple, unskilled work does not adequately reflect her limitations. (*Id.* at 9-10.) However, the undersigned finds that Plaintiff's argument is without merit.

> *Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.
> . . .
> In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks . . . . Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(C)(3). The ALJ began his assessment of Plaintiff's RFC prior to Step Four by explicitly stating that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis'" performed at Step Three of the sequential evaluation. (R. at 26.) That "degree of limitation" included "moderate difficulties" in Plaintiff's ability to maintain concentration, persistence or pace, given Plaintiff's "impaired memory and borderline intellectual functioning." (R. at 25-26.) Specifically, the ALJ noted Plaintiff's testimony that her memory is impaired, that she forgets to pay bills and needs reminders to pay them, and had difficulties in completing assigned work in the past because of physical pain and anxiety. (*Id.*)

At Step Four, the assessment of Plaintiff's RFC, the ALJ found that given Plaintiff's "moderate limitations cited above on concentration, persistence and pace, the undersigned further concludes that the claimant would be limited to simple, unskilled tasks." (R. at 31.) The ALJ based

his decision on Dr. Slaughter's notes from his treatment of Plaintiff throughout 2009 and 2010. (R. at 30.) Specifically, Dr. Slaughter noted that Plaintiff gave up easily on tasks and wanted to "rush things along" at her initial appointment with him. (*Id.*) Furthermore, Dr. Slaughter noted that Plaintiff displayed no indication of any major emotional problems and that there was no indication of memory problems. (*Id.*)

Given this, it s clear that the ALJ considered Plaintiff's limitations on concentration, persistence, and pace when assessing Plaintiff's RFC. After considering the record, particularly Dr. Slaughter's treatment notes, the ALJ determined that while such limitations existed, they did not preclude Plaintiff from performing simple, unskilled work. Plaintiff's reliance on *Stewart* is misplaced.

> First, the question presented in *Stewart* was the availability of attorney's fees under the Equal Access to Justice Act based on an ALJ's contravention of agency regulations and judicial precedent, both in determining RFC and formulating a hypothetical given to a vocational expert. . . . Second, the discussion . . . cite[d] specifically addresses the requirement that hypothetical questions to a vocational expert must include all limitations supported by medical evidence in the record . . . .

*Gullace v. Astrue*, No. 1:11cv-755, 2012 WL 691554, at *21 (E.D. Va. Feb. 13, 2012) (rejecting claimant's argument that the ALJ cumulated his mental impairments into a less-detailed conclusion and that the ALJ failed to include any limitations on concentration, persistence, or pace in his RFC assessment). Rather, Plaintiff cites *Stewart* for the proposition that "all limits on work-related activities resulting from mental impairments must be described in the mental residual functional capacity assessment." (Pl.'s Br. at 10.) As discussed above, the ALJ did describe Plaintiff's credible mental impairments in his RFC assessment. Therefore, the undersigned find that the ALJ properly considered her limitations in concentration, persistence, and pace in his RFC assessment.

### c. The ALJ Did Not Err By Not Including Any Limitations Related to Plaintiff's Neck and Back Impairments in His RFC Assessment

Third, Plaintiff alleges that the ALJ erred by not including any limitations regarding Plaintiff's neck and back impairments in his assessment of her RFC. (Pl.'s Br. at 10-11.) Specifically, Plaintiff alleges that the ALJ should have included limitations related to these impairments, such as Plaintiff's "ability to rotate her head from side to side, or up and down." (R. at 10.) As support for her argument, Plaintiff sets forth her diagnoses and past medical treatments, but does not provide any evidence of documented limitations. (*See id.*) However, the undersigned finds that this argument is without merit.

In his decision, the ALJ discusses the objective medical evidence regarding Plaintiff's neck impairment. In 2007, after her cervical spine surgery, Dr. Rosen noted that Plaintiff had intact sensation, deep tendon reflexes, and normal muscle strength in her upper extremities. (R. at 558-60.) Most notably, Dr. Rosen determined that Plaintiff had no spinal cord impingement and did not require further neurosurgical intervention for her neck. (R. at 558.) On February 17, 2009, Plaintiff visited Tri-State Community Health Center for a physical examination to assess her work ability. (R. at 645.) At this appointment, Plaintiff specifically complained of neck pain. (R. at 645, 649.) However, the examining medical professional determined that Plaintiff could return to a job less strenuous than her past work and did not note any limitations relating to Plaintiff's neck impairment. (R. at 650.) Furthermore, it was noted that Plaintiff had a full range of motion in her neck in all planes. (*Id.*)

Treatment notes in the administrative record from Fast Track Anesthesia Associates also demonstrate that Plaintiff's neck impairment did not result in limitations. On December 9, 2009, Dr. Denise Scaringe-Dietrich noted that Plaintiff had a "good range of motion without pain

reproduction" in her neck. (R. at 679.) This was so despite "spasms in the musculature of the neck and spasms and tenderness on palpation of the neck musculature posteriorly." (*Id.*) Furthermore, nothing in these treatment notes document that Plaintiff had a decreased range of motion in her neck. (*See* R. at 666-89.)

In addition, the ALJ discussed the medical evidence relating to Plaintiff's back impairment. During her treatment with Fast Track Anesthesia Associates, Plaintiff often demonstrated negative straight leg raising and normal sensation and motor function in her lower extremities. (R. at 666-89.) In December of 2009, Dr. Scaringe-Dietrich noted that Plaintiff's back had a good range of motion. (R. at 679.) In January of 2010, Plaintiff's back examination was "without pain with extension, flexion or rotation." (R. at 677.) However, in February, March, and April of 2010, Dr. Scaringe-Dietrich noted that Plaintiff had pain in her back with extension and rotation and also had tenderness in her bilateral SI joint. (R. at 666-75.) Furthermore, in May of 2010, Dr. Arthur Padilla noted that Plaintiff had exaggerated pain from just the sacroiliac joint injection despite the use of local anesthesia. (R. at 713-14.) However, none of the medical evidence suggested that Plaintiff had any limitations related to her back impairment.

In sum, the undersigned finds that the ALJ reasonably accounted for Plaintiff's limitations when assessing her RFC. The ALJ properly evaluated Plaintiff's mental impairments by performing the narrative assessment required by SSR 96-8p and considered her limitations on concentration, persistence, and pace when assessing her RFC. Furthermore, the ALJ did not err by not including any limitations related to Plaintiff's neck and back impairments in his RFC assessment. Therefore, the undersigned finds that substantial evidence supports the ALJ's Step Four assessment of Plaintiff's RFC.

### 2.     The ALJ Properly Relied On the Vocational Expert's Testimony

As her second assignment of error, Plaintiff alleges that the ALJ improperly relied on the testimony given by the vocational expert ("VE") at the administrative hearing.  (Pl.'s Br. at 11.)  First, Plaintiff asserts that the ALJ failed to include "any limitation on concentration, persistence, or pace in his hypothetical question to the vocational expert."  (*Id.* at 11-12.)  Second, Plaintiff alleges that the ALJ "failed to include any restriction specifically related to [her] neck and back in his hypothetical question" to the VE.  (*Id.* at 12 (alteration in original).)  Third, Plaintiff argues that the ALJ erred because the RFC assessment in his written decision exceeds the limitations regarding exposure to extreme cold, vibrations, fumes, odors, gases, and hazards included in the hypotheticals posed to the VE.  (*Id.* at 12-14.)  However, the undersigned finds that Plaintiff's argument is without merit.

If a claimant has met her burden of showing that she is not able to perform her past relevant work, the Commissioner then has the burden of showing that the claimant is able to perform work existing in significant numbers in the national economy.  *See McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).  During the fifth step of the sequential analysis, the ALJ must pose hypotheticals to the vocational expert ("VE") that "fairly set out all of [the] claimant's impairments."  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); *see also Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (hypotheticals must "adequately" describe the claimant's impairments).  However, the ALJ need only include those limitations supported by the record in the hypotheticals.  *Johnson*, 434 F.3d at 659.  Furthermore, an ALJ is not required to "submit to the [VE] every impairment alleged by a claimant."  *Rutherford v. Barnhart*, 399 F.3d

546, 554 (3d Cir. 2005) (alteration in original). Similarly, an ALJ is not required to accept the answers a VE gives to a hypothetical that contains limitations not ultimately adopted by the ALJ. *See Hammond v. Apfel*, 5 F. App'x 101, 105, 2001 WL 87460, at *4 (4th Cir. Feb. 1, 2001) (citing *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986)).

### a. The Jobs Identified By the VE Are Consistent With Plaintiff's Ability to Perform Simple, Unskilled Work

First, Plaintiff asserts that the ALJ failed to include all of Plaintiff's limitations in his hypotheticals to the VE because he failed to include "any limitation on concentration, persistence, or pace." (Pl.'s Br. at 11.) Specifically, Plaintiff alleges that this failure is significant because all of the jobs identified by the VE require a reasoning level of at least 2, which requires the ability to perform detailed instructions. (*Id.* at 12.) Therefore, Plaintiff asserts, these jobs are "outside of the range of work that [she] is capable of performing." (*Id.* (alteration in original).)

"Courts in the Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have recently held that there is no conflict between a job classified at reasoning level three and a limitation to simple, routine, unskilled work." *Thacker v. Astrue*, No. 3:11CV246-GCM-DSC, 2011 WL 7154218, at *3 (collecting cases); *see also Cottman v. Astrue*, No. BPG-08-1753, 2009 WL 4884506, at *6 n.5 (D. Md. Dec. 9, 2009) ("The ALJ's determination that plaintiff could only perform simple tasks, however, is not necessarily inconsistent with a finding that plaintiff can perform the job of surveillance systems monitor"). Furthermore, as stated recently by the Western District of North Carolina:

> Plaintiff's argument is flawed as a matter of law because work requiring a reasoning level two are non inconsistent with a limitation to simple work. Reasoning level two jobs require an individual to apply "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "deal with problems involving a few concrete variables in or from standardized situations," which is

consistent with a limitation to simple work. *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005). Although reasoning level two requires the understanding to carry out detailed instructions, "it specifically caveats that the instructions would be uninvolved–that is, not a high level of reasoning." *Flaherty v. Halter*, 182 F. Supp. 2d 824, 850 (D. Minn. 2001). As explained in *Temple v. Callahan*, 1997 WL 289457, at *2 (9th Cir. May 29, 1997), "work that requires 'commonsense understanding' is simple. Work that requires 'uninvolved written or oral instructions' is simple and routine." As the performance of jobs with a reasoning level of two is not inconsistent with a limitation to simple, routine, repetitive tasks, plaintiff's argument is without merit as a matter of law.

*Pippen v. Astrue*, No. 1:09cv308, 2010 WL 3656002, at *7 (W.D.N.C. Aug 24, 2010); *see also Money v. Barnhart*, 91 F. App'x 210, 215, 2004 WL 362291, at *3 (3d Cir. 2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive."); *Burnette v. Astrue*, No. 2:08-CV-9-FL, 2009 WL 863372, at *5 (E.D.N.C. Mar. 24, 2009) (holding that a limitation to simple, repetitive, routine tasks is consistent with a DOT reasoning level of two); *Miller v. Astrue*, No. 2:06-00879, 2008 WL 759083, at *2 (S.D. W. Va. Mar. 19, 2008); *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005). Here, the jobs identified by the VE–marker, non-postal mail clerk, and router–all require a reasoning level of either 2 or 3. (*See* Pl.'s Br., Exs. 1-3.) Therefore, because reasoning levels of 2 or 3 are consistent with Plaintiff's ability to perform simple, unskilled work, Plaintiff's argument must fail as a matter of law.

Plaintiff also asserts that the ALJ's failure to include any limitations on concentration, persistence, or pace in his hypothetical to the VE caused the VE to identify jobs requiring "a degree of precision and concentration which [she] is incapable of." (Pl.'s Br. at 12.) The Fourth Circuit has not yet addressed the sufficiency of medical evidence incorporated by reference in hypothetical questions to a VE, but other circuits have determined that limiting a claimant to unskilled work adequately accounts for that claimant's limitations in concentration, persistence, and pace. *See*

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (concluding that the ALJ's reference to a moderate limitation in maintaining "attention and concentration" sufficiently represented the claimant's limitations in concentration, persistence, and pace); *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (concluding that a hypothetical adequately incorporated the claimant's limitations in concentration, persistence, and pace when the ALJ instructed the vocational expert to credit fully medical testimony related to those limitations). *But see, e.g., Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (directing ALJ on remand to pose a hypothetical to the VE that specifically accounted for claimant's moderate limitations in maintaining concentration, persistence, and pace); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (a reference to "simple tasks" or unskilled work in a hypothetical is not sufficient to account for mental impairments such as difficulty with concentration, persistence, or pace); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) (limiting hypothetical to simple, unskilled work does not account for difficulties with memory, concentration, or mood swings); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004) (hypothetical restricting to simple one or two-step tasks does not account for limitations of concentration).

In 2011, the Fourth Circuit distinguished *Ramirez* and *Winschel*, stating:

> The Third and Eleventh Circuits both noted that 'there may be a valid explanation for this omission from the ALJ's hypothetical,' . . . but such explanation was not supported by the record.  Here, although the ALJ gave . . . the benefit of the doubt at step 2, . . . at step four the ALJ noted that [the claimant] had been successfully treated and therefore concluded that her mental residual functional capacity ("RFC") was not restricted.

*Thompson v. Astrue*, 442 F. App'x 804, 806 n.2, 2011 WL 3489671, at *2 n.2 (4th Cir. 2011).

Furthermore, in *Winschel*, the Eleventh Circuit determined that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite

limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Winschel*, 631 F.3d at 1180 (citations omitted).

The undersigned finds that the ALJ's decision that Plaintiff can engage in simple, unskilled work despite moderate limitations in concentration, persistence, and pace is supported by substantial evidence, and the hypothetical to the VE was appropriate. The ALJ relied on the two consultative psychological examinations performed by Dr. Slaughter. (R. at 30.) In May of 2009, Dr. Slaughter noted that Plaintiff wanted to "rush things along" and "gave up easily on tasks." (R. at 603.) He also noted that Plaintiff did not complete the evaluation in one session because she left prior to finishing her personality questionnaire. (*Id.*) In May of 2010, Dr. Slaughter reported that Plaintiff "may withdraw under stress" and that there was "no indication of short-term or long-term memory problems." (R. at 719.) As discussed above, the ALJ did describe Plaintiff's credible mental impairments in his assessment of Plaintiff's RFC. The medical evidence contained in the administrative record shows that Plaintiff can engage in simple, unskilled work despite her limitations in concentration, persistence, and pace. Therefore, the undersigned finds that limiting the hypothetical to the VE to include simple, unskilled work sufficiently accounts for such limitations. *See Sensing v. Astrue*, No. 6:10-cv-03084, at *6-7 (D.S.C. Mar. 26, 2012) (determining that limiting the hypothetical to include simple one- and two-step tasks and avoiding contact with the public sufficiently accounted for claimant's limitations in concentration, persistence, and pace); *Gullace*, 2012 WL 691554, at *21-22 (finding that the ALJ properly considered claimant's limitations in concentration, persistence, and pace in both his RFC assessment and hypothetical to the VE when he limited claimant to routine, repetitive, unskilled light work with little interaction

with coworkers or the public).

### b. The ALJ Properly Did Not Include Restrictions Related to Plaintiff's Back and Neck In His Hypotheticals To the VE

Second, Plaintiff alleges that although she has a severe neck impairment and a sacroiliitis, the ALJ failed to include any restrictions related to these impairments in his hypotheticals to the VE. (Pl.'s Br. at 12.) Plaintiff does not cite to any evidence in the record to support this assertion. As discussed above, the record contains substantial evidence that Plaintiff's neck impairment did not result in functional limitations. Furthermore, the ALJ discussed that despite Plaintiff's complaints of back pain, there were several times when treating physicians noted that Plaintiff had a good range of motion in her back, a normal gait, and normal sensation. (R. at 27-29.) Even so, the ALJ included in his hypothetical to the VE that Plaintiff was never to crawl or climb ropes, ladders, or scaffolds and could only occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. (R. at 67.) Therefore, the undersigned finds that Plaintiff's argument is without merit.

### c. The ALJ's Restriction Regarding Exposure to Extreme Cold, Vibrations, Fumes, Odors, Gases and Hazards Is a Typographical Error and Is Harmless

Third, Plaintiff alleges that the ALJ's hypothetical to the VE "did not accurately reflect the residual functional capacity assessment." (Pl.'s Br. at 12.) Specifically, Plaintiff asserts that the hypothetical failed to include all restrictions because the ALJ asked the VE to assume someone who was limited to positions not involving concentrated exposure to extreme cold, vibrations, fumes, odors, gases, or hazards, but the ALJ's decision noted that Plaintiff could not be exposed to these at all. (*Id.* at 12-13.) According to Plaintiff, the VE's answers are defective and cannot be considered substantial evidence because the ALJ failed to accurately include Plaintiff's restrictions. (*Id.* at 14.) However, the undersigned finds that Plaintiff's argument is without merit.

The undersigned finds that the ALJ's decision noting that Plaintiff should have no exposure to these work-related functions appears to be a typographical error. At the hearing, the ALJ asked the VE to assume an individual who could have no concentrated exposure to these functions. (R. at 67.) Furthermore, the ALJ assigned great weight to the opinion of medical consultant Dr. Fulvio Franyutti, who determined that Plaintiff needed to avoid concentrated exposure to these functions. (R. at 31, 590.) Finally, the same ALJ, in a prior decision remanded by the Appeals Council, determined that Plaintiff needed to avoid concentrated exposure to these functions. (R. at 89, 97.) Therefore, remand is not warranted because of this typographical error.

Even assuming that the ALJ's finding was not a typographical error, the undersigned finds that it is harmless error. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008); *see also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); *Hurtado v. Astrue*, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("The court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); *cf. Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached."). Here, the three jobs identified by the VE that Plaintiff could perform never require exposure to these work-related functions. (*See* Pl.'s Br., Exs. 1-3.) Therefore, even though the

hypothetical posed to the VE was inconsistent with the ALJ's assessment of Plaintiff's RFC in his decision, this error is harmless because it does not change the outcome of Plaintiff's case.

In sum, substantial evidence supports the ALJ's reliance on the VE's testimony. The jobs identified by the VE are consistent with Plaintiff's ability to perform simple, unskilled work, and the limitation to simple, unskilled work accounts for Plaintiff's limitations of concentration, persistence, or pace. Furthermore, the ALJ's decision noting that Plaintiff could have no exposure to extreme cold, vibrations, fumes, odors, gases or hazards is at best a typographical error or at worst a harmless error. Therefore, the undersigned finds that substantial evidence supports the ALJ's Step Five determination that jobs that Plaintiff could perform exist in significant numbers.

## VI.    <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's applications for disability insurance benefits and supplemental security income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such

Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **9th** day of **April**, 2012.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE